United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONARD ORDONIO, *et al.*, | No. C-11-4570 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| COUNTY OF SANTA CLARA, *et al.*, | |
| Defendants. | **(Docket No. 19)** |
| _____/ | |

Defendants' motion to dismiss Plaintiffs' complaint came on for hearing before the Court on March 23, 2012.[1] Docket No. 19. For the reasons set forth below, the Court **GRANTS** Defendants' motion to dismiss.

## I. FACTUAL & PROCEDURAL HISTORY

On October 20, 2010, Plaintiff Leonard Ordonio went to the Emergency Room at Santa Clara Valley Medical Center ("SCVMC") after having signs of a heart attack. FAC ¶ 15. The doctors discovered that Mr. Ordonio had four blocked arteries and scheduled Mr. Ordonio for surgery with Dr. Kai Ihnken. FAC ¶ 17. On October 25, the staff informed Plaintiffs that the surgery would be performed on Wednesday, October 27. FAC ¶ 18. When Plaintiffs received no further information that night, Plaintiff Claudia Ordonio wrote a letter to President Obama complaining of the lack of immediate car. FAC ¶ 19. On October 26, Plaintiffs were told that the surgery would no longer take place on October 27, but would probably take place the following week. FAC ¶ 20. On October 28,

---

[1] Plaintiffs' counsel failed to appear at the hearing, and the Court declines to have a re-hearing on this motion.

staff informed Plaintiffs that the surgery would be on October 29. FAC ¶ 21. However, on October 29, the staff informed the Ordonios that the surgery would again have to be rescheduled. FAC ¶ 22. Over the weekend, staff informed the Ordonios that the surgery would be scheduled for November 2. FAC ¶ 23.

After getting little to no further information, Mrs. Ordonio e-mailed Dr. Ihnken on October 31, asking to meet with him. FAC ¶ 24. Dr. Ihnken met with Plaintiffs the following day, and informed Plaintiffs that he was not allowed to perform Mr. Ordonio's surgery. FAC ¶ 25. Dr. Ihnken's access to the computer, hospital, and his patients had been terminated due to Dr. Ihnken's lawsuit against the hospital. FAC ¶¶ 27, 29. The hospital confirmed that they would substitute another surgeon. FAC ¶ 25. Plaintiffs were not satisfied with the alternate surgeon's credentials and asked for Mr. Ordonio to be transferred to Stanford so that Dr. Ihnken could perform the surgery. FAC ¶¶ 25-26. Staff then went to Mr. Ordonio, telling him that he should have the surgery on November 2 with the alternative surgeon or that he would die. FAC ¶ 26. Defendants then transferred Mr. Ordonio to Stanford on November 2, where Dr. Ihnken performed the surgery on November 3. FAC ¶ 31.

During Mr. Ordonio's stay at SCVMC, Plaintiffs allege that Mr. Ordonio's sheets were never changed, and that he was never given a bath or assistance to take a shower. FAC ¶ 30. Also during this time, two patients sharing Mr. Ordonio's room passed away, resulting in Plaintiffs' increased anxiety about the need for immediate surgery. FAC ¶ 30. In 2011, Plaintiffs received a bill for over $300,000 from SCVMC for the two weeks that Mr. Ordonio was hospitalized. FAC ¶ 32.

Based on these actions, Plaintiffs brought this suit against Defendants County of Santa Clara, SCVMC, Alfonso Banuelos, Hollister Brewster, and Dolly Goel. Plaintiffs raise 42 U.S.C. § 1983 claims based on the: (1) first amendment right to free association, (2) fourteenth amendment right to due process liberty, (3) fourteenth amendment right to due process property rights, (4) fourteenth amendment right to equal protection, and (5) fifth amendment takings clause. Plaintiffs also bring various state and common law claims. Defendants now move to dismiss the federal claims with prejudice, on the ground that Plaintiffs have not alleged interference with federal constitutional rights. Docket No. 19 at 2 ("Motion").

2

## II. DISCUSSION

A.  Standard of Review

In a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the complaint must be construed in a light most favorable to the non-moving party and all material allegations in the complaint are to be taken true. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). However, this favorable construction does not apply to "legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While a complaint does not normally need detailed factual allegations to survive a Rule 12(b)(6) motion, the plaintiff must provide grounds demonstrating his entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the plaintiff must allege sufficient factual allegations "to raise a right to relief above the speculative level." *Id.* While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (quoting *Ashcroft*, 129 S. Ct. at 1949). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949. This threshold is reached when the plaintiff pleads sufficient facts to allow the Court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.*

If dismissal is appropriate, leave to amend should be freely given unless "amendment of the complaint would be futile." *Albrecht v. Lurid*, 845 F.2d 193, 195 (9th Cir. 1988). Thus, where the Court "determines that the 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' then the dismissal without leave to amend is proper." *Id.* (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986))

B.  First Amendment Right to Free Association

  1.  Intimate Relationship

Plaintiffs allege that Defendants interfered with their first amendment right of association when Defendants refused Dr. Ihnken access to Plaintiffs. Docket No. 21 at 6 ("Opp."). The Supreme Court has recognized two types of freedom of association. First, the Supreme Court

3

recognizes that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v. U.S. Jaycees*, 468 U.S. 609 617-18 (1984). This freedom to enter into intimate human relationships is not protected by the first amendment, but by the fourteenth amendment. *See IDK, Inc. v. Cnty. of Clark*, 836 F.2d 1185, 1192 (9th Cir. 1988) ("In protecting certain kinds of highly personal relationships, the Supreme Court has most often identified the source of the protection as the due process clause of the fourteenth amendment, not the first amendment's freedom to assemble."). Second, the Supreme Court recognizes "a right to associate for the purpose of engaging in those activities protected by the First Amendment–speech, assembly, petition for redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618.

In the instant case, Plaintiffs raise a claim for interference of the "intimate relationship" between Plaintiffs and Dr. Ihnken, created by their doctor-patient relationship. Opp. at 6. As discussed above, this freedom to enter into intimate relationships is protected by the fourteenth amendment, not the first amendment. Plaintiffs do not allege that Defendants interfered with Plaintiffs' and Dr. Ihnken's relationship to prevent them from engaging in an activity protected by the first amendment.

In determining which "highly personal relationships" are protected by the fourteenth amendment, the Ninth Circuit has recognized such relationships where:

> [t]he individuals are deeply attached and committed to each other as a result of their having shared each other's thoughts, beliefs, and experiences. By the very nature of such relationships, one is involved in a relatively few intimate associations during his or her lifetime. The facts relevant in determining whether a particular association can claim the protection of the due process clause are the group's size, its congeniality, its duration, the purposes for which it was formed, and the selectivity in choosing participants.

*IDK, Inc.*, 836 F.2d at 1193. In *IDK, Inc.*, the Ninth Circuit found that the relationship between an escort and a client was not a protected relationship because it lasted for a short period of time (*i.e.*, as long as the client is willing to pay the fee), which suggested that no deep attachments or commitments were created. *Id.* The court also found that the escort did not have a choice in who a

4

relationship was made with and could have a large number of clients. *Id.* Based on these findings, the Ninth Circuit concluded that "the relationship between a client and his or her paid company may well be the antithesis of the highly personal bonds protected by the fourteenth amendment." *Id.* As the relationship at issue was not the type that would have "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs," it was not protected by the fourteenth amendment. *Id.*

The Court finds that in the instant case, the doctor-patient relationship between Dr. Ihnken and Plaintiffs is not an intimate relationship (particularly as it revolves around one surgery and is not an ongoing relationship) protected by the freedom of association. Plaintiffs offer no authority recognizing a doctor-patient relationship as an intimate relationship. Instead, Plaintiffs argue that because intimate relationships include spouses, grandparents, and close friendships, the doctor-patient relationship should also qualify as an intimate relationship. Opp. at 5. Such relationships are distinguishable from the doctor-patient relationship, which is based on payment for services. Significantly, unlike relationships between family members and friends, the doctor-patient relationship asserted here does not concern a long series of shared, intimate thoughts and experiences, but is instead a professional relationship that does not continue beyond the episodic services sought and rendered.

The limited nature of a doctor-patient relationship is especially apparent in the instant case, where SCVMC assigned Dr. Ihnken as Mr. Ordonio's surgeon rather than Plaintiffs and Dr. Ihnken making a mutual decision to have Dr. Ihnken perform the surgery. FAC ¶ 17. Plaintiffs did not meet Dr. Ihnken until over a week after being assigned to his services, and Plaintiffs do not allege that they developed a close, intimate relationship with Dr. Ihnken beyond the surgery itself. FAC ¶¶ 17, 25. Instead, based on the facts alleged, Plaintiffs and Dr. Ihnken had a very limited relationship that extended only to the surgery, but involved no intimacy outside of that service. Plaintiffs cannot allege an intimate relationship based on the doctor-patient relationship in this case, as there are no facts alleging that Plaintiffs and Dr. Ihnken had any deep attachments or commitments as a result of their shared thoughts, beliefs, and experiences.

1    Accordingly, the Court finds that Plaintiffs cannot raise a claim for interference with their
2 first amendment right of association, as the doctor-patient relationship at issue is not an intimate
3 relationship protected by the first or fourteenth amendment.

4    2.   Retaliation

5    In their opposition papers, Plaintiffs raise a claim for first amendment retaliation. In general,
6 "[t]he First Amendment forbids government officials from retaliating against individuals for
7 speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Hartman v.
8 Moore*, 547 U.S. 250, 256 (2006)). To establish a first amendment retaliation claim, the plaintiff
9 must demonstrate that:

> (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.

13 *Id.*

14    In the instant case, Plaintiffs allege that after their surgery was delayed, they made
15 complaints to the hospital administration and sent a letter to President Obama about the hospital
16 conditions. FAC ¶¶ 19, 26-28. Plaintiffs allege that in retaliation for these complaints, Defendants
17 provided substandard care, including failing to change Mr. Ordonio's bed sheets and not providing
18 him assistance with personal hygiene during his two-week stay. FAC ¶ 30. Plaintiffs allege that the
19 denial of personal care and delay in treatment satisfies the chilling requirement.[2] Opp. at 7.

20    Assuming that Plaintiffs' complaints about substandard care was a constitutionally protected
21 activity, Plaintiffs have not pled facts demonstrating that these complaints caused the substandard
22 care or delay of surgeries. According to the complaint, Mr. Ordonio was admitted on October 20,
23 2010. FAC ¶ 17. On October 21, Plaintiffs were informed that Dr. Ihnken and the cardiologist
24 would consult on the case on October 25, 2010. FAC ¶ 17. On October 25, Plaintiffs were informed
25 that the surgery would take place on October 27. FAC ¶ 18. That night, Mrs. Ordonio wrote a letter

---

[2] Plaintiffs also allege that Defendants retaliated when they refused to allow Dr. Ihnken access to his patients in retaliation. Plaintiffs, however, argue that this retaliation was in response to Dr. Ihnken's lawsuit, *not* Plaintiffs' complaints about their treatment. Opp. at 7.

United States District Court
For the Northern District of California

to President Obama, expressing her concerns about the lack of immediate surgery. FAC ¶ 19. The following day, Plaintiffs were told that the surgery would not be on October 27. FAC ¶ 20. On October 28, staff informed Plaintiffs that the surgery would be on October 29. FAC ¶ 21. On October 29, the surgery was again delayed and scheduled for November 2. FAC ¶¶ 22-23. On October 31, Mrs. Ordonio e-mailed Dr. Ihnken, who met with Plaintiffs on November 1. FAC ¶¶ 24, 25. After this meeting, Mrs. Ordonio complained to customer service and demanded a transfer to Stanford. FAC ¶¶ 25, 26. Plaintiffs' counsel, who was also Dr. Ihnken's counsel, also wrote to SCVMC on November 1, complaining of retaliation against Dr. Ihnken. FAC ¶ 27. Mr. Ordonio was ultimately transferred to Stanford on November 2, where Dr. Ihnken performed surgery on November 3. FAC ¶ 31.

Plaintiffs do not allege that Defendants knew of any complaints until November 1, when Mrs. Ordonio complained directly to hospital staff. While Plaintiffs sent a letter to President Obama on October 25, Plaintiffs do not allege that Defendants were aware of this letter. Moreover, it is implausible that a letter to the President would have engendered a retaliatory effort by the hospital to suddenly place Mr. Ordonio in substandard care. There is also no allegation that Defendants were aware of Plaintiffs' e-mail to Dr. Ihnken on October 31 until the November 1 complaints.

As to the November 1 complaints, these complaints could not have caused any substandard treatment or delays in surgery made prior to November 1. Plaintiffs allege that Mr. Ordonio received substandard treatment for the two weeks prior to his transfer to Stanford on November 2; thus, the vast majority of this treatment occurred prior to the November 1 complaints. FAC ¶¶ 30, 31. The delays in the surgery also occurred on October 25, 26, 28, and 29, all prior to the November 1 complaints. FAC ¶¶ 20, 23. Thus, the actions that Plaintiffs allege were in retaliation occurred prior to November 1, and could not have been in retaliation for the November 1 complaints.

Accordingly, the Court finds that Plaintiffs cannot establish a first amendment retaliation claim because the alleged retaliatory acts occurred prior to Defendants' knowledge of any complaints by Plaintiff. Nor is the claim plausible under *Twombly* and *Iqbal*.

///

///

### 3. Third Party Retaliation

In their opposition papers, Plaintiffs raise a claim for third party relationship based on Defendants' retaliatory actions against Dr. Ihnken. Opp. at 8. Plaintiffs argue that Dr. Ihnken was constitutionally protected from retaliation for filing a whistle blower complaint and subsequent lawsuit. Opp. at 8. When Defendants retaliated against Dr. Ihnken by restricting his access to the hospital and patients, harms suffered by Dr. Ihnken "passed" onto Dr. Ihnken's patients, including Plaintiffs. Opp. at 8-9.

In support, Plaintiffs point to *Camacho v. Brandon*, in which the Second Circuit found that the plaintiff had constitutional standing to assert the claims of a third party if the plaintiff demonstrated: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would make plaintiff an effective advocate for the third party's rights, and (3) some hindrance to the third party's ability to protect his or her own interests. 317 F.3d 153, 159 (2d Cir. 2003). There, the plaintiff was a city council aide with a close relationship with one of the council members. *Id.* The plaintiff claimed that he was fired in retaliation for the council member casting a vote contrary to the defendants' interests. *Id.* at 160. The Second Circuit found that the plaintiff was an effective advocate for the council member's rights because of their close working relationship, and because the defendants had linked the plaintiff's continued employment with the council member's political affiliation and vote. *Id.* The court also found that the council member was hindered in his ability to bring a claim because he did not suffer any direct harm as a result of the aide's firing and the institution of litigation could result in further retribution. *Id.* Thus, the court concluded that the plaintiff could bring a third party retaliation claim.

Even under *Camacho*, Plaintiffs have not established standing to bring a third party retaliation claim on behalf of Dr. Ihnken. First, Plaintiffs have not demonstrated that there is a close relationship between Plaintiffs and Dr. Ihnken that would make Plaintiffs an effective advocate for Dr. Ihnken's rights. Unlike the close working relationship between the aide and the council member in *Camacho*, Plaintiffs and Dr. Ihnken had a limited relationship in which Dr. Ihnken was Mr. Ordonio's doctor. Plaintiffs and Dr. Ihnken did not even meet until November 1, after Dr. Ihnken's privileges were suspended. FAC ¶ 25. There are no facts alleged that suggest that the limited

relationship between Plaintiffs and Dr. Ihnken would permit Plaintiffs to act as an effective advocate for Dr. Ihnken's rights.

Second, even if Plaintiffs were in a position to act as an effective advocate for Dr. Ihnken's rights, Plaintiffs have not argued that Dr. Ihnken requires such an advocate. Unlike the council member in *Camacho*, Dr. Ihnken suffered legally recognizable harms when he was suspended from the hospital and kept from his patients, affecting his economic well-being. Dr. Ihnken also has no reason to fear further retribution from which he has already suffered, permitting him to bring his own suit. In fact, Plaintiffs admit that Dr. Ihnken has brought his own lawsuit, and Defendants confirmed at the hearing on this motion that Dr. Ihnken's suit is still active in state court. *See also* Opp. at 6. Thus, Dr. Ihnken does not need to protect his rights by acting through third parties such as Plaintiffs.

Accordingly, the Court finds that Plaintiffs cannot raise a claim for third party retaliation as Plaintiffs are not in a position to serve as an effective advocate for Dr. Ihnken and Dr. Ihnken is in no need of a third party advocate.

C.  Fourteenth Amendment Liberty Interest

Plaintiffs allege that their liberty interests were impeded when Defendants kept Mr. Ordonio in the hospital under the false impression that he would be receiving surgery from Dr. Ihnken. FAC ¶ 41. The fourteenth amendment "protects a citizen's liberty interest in their own bodily security." *Kenned v. Ridgefield City*, 439 F.3d 1055, 1061 (9th Cir. 2006). However, although a state's failure to protect an individual against injury does not normally violate due process guarantees, "it can where the state action 'affirmatively places the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 201 (1989)).

Under the "danger creation" exception, liability exists where "a state actor . . . affirmatively places an individual in danger by acting with deliberate indifference to a known or obvious danger in subjecting the plaintiff to it." *Huffman v. Cnty. of LA*, 147 F.3d 1054, 1061 (9th Cir. 1988) (citations omitted). In the instant case, Plaintiffs argue that Defendants "created" a danger because they knew that Mr. Ordonio was at great risk of a heart attack and informed Plaintiffs that he would

need immediate surgery. Opp. at 10. Defendants then increased the risk of a heart attack by not giving Plaintiffs information about the impending surgery, subjecting Mr. Ordonio to substandard care, attempting to coerce Mr. Ordonio into accepting surgery with another surgeon or risk death, and allowing Mr. Ordonio to witness two hospital roommates die while awaiting surgery. Opp. at 10-11. Plaintiffs thus allege that Defendants added to the fear and risk of a heart attack that Mr. Ordonio already had by exposing Plaintiffs to circumstances that expressed his stress and symptoms.

The Court finds that Plaintiffs have not alleged Defendants engaged in deliberate indifference to a known or obvious danger by keeping Mr. Ordonio in the hospital for two weeks. Mr. Ordonio was not placed in any greater danger while staying at SCVMC than he would have faced had he remained at home, as he would still have had a serious heart condition that put him at risk of a heart attack. Likewise, informing Mr. Ordonio that he was at risk did not create a danger; the act simply alerted Mr. Ordonio to the dangers that he was already in, rather than creating the danger.

Furthermore, even if the danger creation exception applied, Plaintiffs have not demonstrated a violation of their liberty interest. Plaintiffs were not detained or restrained from leaving the hospital; even if Defendants "promised" that Dr. Ihnken would perform the surgery, Plaintiffs could have left or transferred to a different hospital. FAC ¶ 41. The fact that Plaintiffs chose to stay at the hospital does not create an unlawful restraint. While Plaintiffs also allege that Defendants attempted to coerce and intimidate Mr. Ordonio into accepting surgery with other another surgeon or risk death, this act did not occur until November 1, nearly two weeks after Mr. Ordonio was admitted. FAC ¶ 26. Upon Mrs. Ordonio's request for a transfer, Mr. Ordonio was transferred the following day. FAC ¶¶ 26, 31. Based on these allegations, Plaintiffs cannot establish that they were unlawfully restrained or detained at SCVMC. Nor did Defendants place Mr. Ordonio in danger within the meaning of due process.

Accordingly, the Court finds that Plaintiffs cannot establish a claim for violation of their fourteenth amendment liberty interests.

///

///

D.   Fourteenth Amendment Property Interest

Plaintiffs allege that their fourteenth amendment property interests were impeded when Defendants billed Plaintiffs $300,000 for their hospital stay. FAC ¶ 54. Analysis of a fourteenth amendment procedural due process claims proceeds in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

In determining whether a property interest is protected by procedural due process, the plaintiff must have "more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim or entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property interests are not created by the Constitution, but are created and defined by existing rules or understandings that stem from independent sources, such as state law. *Id.*

Plaintiffs argue that under *Horn v. City of Chicago Datacom Systems Corp.*, a defendant's demand of more money than what was owed amounted to a constitutional deprivation. No. 85 C 6838, 1986 U.S. Dist. LEXIS 22300, at *33-34 (N.D. Ill. July 25, 1986). There, the plaintiffs alleged that the city sent notices that charged fines in excess of the amount stated on the parking tickets. *Id.* at *7. While the court found that the plaintiffs who had received the notice *and* paid the excess fines had standing to bring the case, the plaintiffs who received the notice but had not paid the demanded amount lacked standing. *Id.* at *10-12. The Court finds that the applicability of *Horn* is questionable, as *Horn* was reversed by the Seventh Circuit, which found that the notices reasonably informed the plaintiffs that they could contest the amounts demanded and thus there was no due process violation. *Horn v. City of Chicago*, 860 F.2d 700, 704-05 (7th Cir. 1988). Even if *Horn* was good law, Plaintiffs have not paid the $300,000 owed and would not fall under the standing requirements of *Horn*.

More importantly, the Court finds that even if Plaintiffs established a liberty or property interest that has been interfered with by the state, Plaintiffs have not alleged facts demonstrating that Defendants failed to observe constitutionally sufficient procedures. Plaintiffs simply make a

11

conclusory allegation that Defendants did not afford Plaintiffs an opportunity to be heard, without any specificity. FAC ¶ 55. Plaintiffs have not alleged that they attempted to contest the bill and were rebuffed, that they were prevented from challenging the amount owed, or that the money was taken without an opportunity to be heard. Furthermore, should Plaintiffs not pay the amount demanded, the hospital would have to sue in court to get judgment. At that point, Plaintiffs would have the opportunity to plead their case and argue that $300,000 is an incorrect figure. Thus, Plaintiffs have failed to allege that they were deprived of their procedural due process rights.

Accordingly, the Court finds that Plaintiffs cannot establish a claim for deprivation of a fourteenth amendment property interest.

E.  Fourteenth Amendment Equal Protection

Plaintiffs allege that Defendants violated Plaintiffs' fourteenth amendment right to equal protection when they were given different treatment because they lacked medical insurance and because they were patients of Dr. Ihnken. FAC ¶¶ 58, 59. In their opposition to Defendants' motion to dismiss, Plaintiffs rely solely on their status as Dr. Ihnken's patients in bringing their equal protection claim. Opp. at 13-15.

In general, to bring an equal protection claim, the plaintiff must "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Thorton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (citation omitted). To bring a "class of one" equal protection claim, the plaintiff must demonstrate that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 1167 (quoting *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002)). "[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government action." *Gerhart v. Lake Cnty. Mont.*, 637 F.3d 1013, 1023 (9th Cir. 2011). Thus, the rational basis prong requires that the Court determine if Defendants had a rational basis for singling out Plaintiffs. *Id.*

The Ninth Circuit has not yet defined what it means to be "similarly situated" under the class of one theory. Several courts in the Ninth Circuit have relied upon persuasive authority to find that

1 the "level of similarity between the plaintiff and the persons with whom they compare themselves
2 must be extremely high." *Morris v. State Bar of Cal.*, Case No. CV F 09-0026 LJO GSA, 2010 U.S.
3 Dist. LEXIS 57074, at *21 (E.D. Cal. June 9, 2010) (quoting *Neilson v. D'Angelis*, 409 F.3d 100,
4 104 (2d Cir. 2005)); *see also Mazzeo v. Gibbons*, Case No. 2:08-cv-01387-RHL-PAL, 2010 U.S.
5 Dist. LEXIS 115044, at *21 (D. Nev. Oct. 28, 2010) (citing *Purze v. Vill. of Winthrop Harbor,* 286
6 F.3d 452, 455 (7th Cir. 2002)); *Davis v. Powers*, No. C08-5751 FDB/KLS, 2010 U.S. Dist. LEXIS
7 52067, at *31-32 (W.D. Wash. Apr. 16, 2010).

8 In the instant case, Plaintiffs claim that they were treated differently from other "similarly
9 situated" patients at SCVMC, *i.e.* all other patients who suffered serious heart conditions requiring
10 immediate surgery. FAC ¶ 60; Opp. at 14. Plaintiffs thus attempt to compare themselves with all
11 patients with similar heart conditions as Mr. Ordonio, even if these patients had surgeons who were
12 not suspended as Dr. Ihnken was. The Court finds that the two groups are not similarly situated, as
13 there is a significant distinction between the two groups – Plaintiffs had a surgeon who was
14 suspended from the hospital, while the other patients had surgeons who were still active in the
15 hospital.

16 Even if the Court did compare Plaintiffs with all other SCVMC patients with similar heart
17 conditions, Defendants have articulated a rational basis for treating Dr. Ihnken's patients differently
18 from other patients. Dr. Ihnken had been suspended and his access to the hospital cut off, which
19 would rationally affect his ability to access his patients and cause delays in surgery. To find
20 otherwise would prevent a hospital from ever suspending a surgeon, even with cause, without
21 running into constitutional problems when the suspended surgeon's patients must be transferred to
22 other surgeons or delays in their treatment arise.

23 Accordingly, the Court finds that Plaintiffs cannot establish an equal protection claim.

24 F.     Fifth Amendment Taking

25 Finally, Plaintiffs allege that Defendants committed a fifth amendment taking when they
26 "attempt[ed] to bill Plaintiffs for over $300,000 in medical bills." FAC ¶ 69. The Fifth Amendment
27 prohibits the taking of "private property . . . for public use without just compensation." U.S. Const.
28

Amend. V. To establish a Fifth Amendment claim, Plaintiffs must establish that the property at issue was their private property and that it was taken without just compensation.

In the instant case, Plaintiffs have yet to pay Defendants the $300,000 allegedly owed. Thus, a taking has not yet occurred. Although Plaintiffs argue that a demand for payment is a constitutional deprivation and that a transfer of funds is not necessary to bring a claim, the authority cited by Plaintiffs does not support Plaintiffs' argument.

First, Plaintiffs argue that according to *Horn*, a mere demand for payment is a constitutional deprivation. Opp. at 16. As discussed above, even if *Horn* was still good law, *Horn* found that the plaintiffs who did not pay the overcharge lacked standing to bring a claim. 1986 U.S. Dist. LEXIS 22300, at *10-12. Thus, under *Horn*, Plaintiffs would not satisfy the standing requirements required in that case.

Second, Plaintiffs cite *Asociacion de Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Galarza*, arguing that there the First Circuit found that a challenge to a statute that required a direct transfer of funds was ripe even if the transfer had yet to occur. Opp. at 15 (citing 484 F.3d a, 14-15 (1st Cir. 2007)). *Galarza* concerned insurance premiums generated by Puerto Rico's compulsory liability insurance law, which were supposed to be transferred to the plaintiff organization. 484 F.3d at 8-10. A statute was passed that permitted the Secretary of Treasury to withhold the insurance premiums; pursuant to this statute, the Secretary retained $73 million in funds that were otherwise due to the plaintiff. *Id.* at 10. The First Circuit found that the claim was ripe because it concerned a facial challenge to the statute, and a facial challenge is usually ripe the moment the challenged regulation or ordinance is passed. *Id.* at 14-15. The First Circuit also found that the claim was ripe because a taking of the money had *already occurred*, as the Secretary refused to transfer the $73 million owed to the plaintiff organization. *Id.* at 15. *Galazra* is thus distinguishable from the instant case, as Plaintiffs do not bring a facial challenge to a statute or regulation but to a disputed hospital bill. More importantly, Plaintiffs have yet to pay the bill, and thus no actual taking has yet to occur.

Because Plaintiffs have yet to pay the $300,000 bill and Defendants have not seized any of Plaintiffs' assets, Plaintiffs have not established that taking has occurred. The $300,000 bill alone is

14

insufficient to raise a takings claim, particular where as noted above, Plaintiff has procedural rights to challenge the bill. Accordingly, the Court finds that Plaintiffs cannot raise a claim for fifth amendment taking.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' federal claims. The Court finds that Plaintiffs' § 1983 claims are reliant upon theories that are not supported by the facts of this case or by any legal authority. As Plaintiffs are not able to plead any set of facts that would give rise to the constitutional claims asserted in the complaint, dismissal with prejudice is warranted. Without the § 1983 claims, the Court lacks subject matter jurisdiction over this case, and dismisses the case for lack of jurisdiction. The Court of the Clerk is directed to close the file in this case.

This order disposes of Docket No. 19.

IT IS SO ORDERED.

Dated: April 5, 2012

_____
EDWARD M. CHEN
United States District Judge

15